**The Application of Angel MARINGOLO and Antonio Troiano For a Writ of Habeas Corpus to Inquire Into Their Detention By The District Director of Immigration and Naturalization of New York.**

**No. 69 Civ. 4040.**

United States District Court
S. D. New York.

Sept. 23, 1969.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York for the United States; William M. Tendy, Asst. U. S. Atty., Daniel Riesel, Sp. Asst. U. S. Atty., of counsel.

David M. Markowitz, New York City, for petitioners.

FRANKEL, District Judge.

The petitioners for habeas corpus are in prison under warrants by the Immigration and Naturalization Service pending deportation proceedings which must inevitably be delayed for some months from now. They complain that their confinement is unlawful because the determination that each must post a $25,000 bond as a condition of release amounts in the circumstances to an abuse of the discretion over such matters confided to the Attorney General and his delegates. They concede in this argument that the matter does lie in executive

discretion, subject only to broad outer limits beyond which may be found relatively rare and vaguely defined cases of "abuse." Cf. Wong Wing Hang v. Immigration and Naturalization Service, 360 F.2d 715, 718–19 (2d Cir. 1966). The Attorney General's representative, on the other hand, concedes that petitioners have selected the appropriate procedure for their complaint, and has in general followed a commendable course of dealing directly and exclusively with the substance of the problem.[1]

## I.

Both petitioners are natives and citizens of Argentina. They arrived here on the same airplane on May 1, 1969, both, the government alleges, carrying false travel documents and claiming false identities. Maringolo (whose true name is reported to be Pedro Valela), the government further says, was arrested when he arrived and found to be possessed of 5½ pounds of heroin. Troiano (or Ernesto Fernandez) was arrested shortly afterwards by customs officers. Both were imprisoned on the criminal complaints against them while the United States prepared to submit the charges to a grand jury. Bail was set at $100,000 for Maringolo and $50,000 for Troiano. Unable to meet those requirements, they remained in custody for what has now lengthened to a period of five months.

On July 29, 1969, both were indicted—Maringolo for illegal importation and possession of narcotics under 21 U.S.C. § 174, and Troiano for the use of a false passport under 18 U.S.C. § 1546. Arraigned on the same day, they entered pleas of not guilty and sought reductions in the amounts of bail they had been unable to post. Among the matters pressed upon Judge Abruzzo in this connection was the point that preparation of their defense was hampered by their incarceration, partly because neither speaks English and the convening of counsel and interpreter in the House of Detention was a cumbersome constraint. Judge Abruzzo was also made aware of the prospect that petitioners would face deportation proceedings at some point after the trial of the pending indictments, but such proceedings had not yet been instituted. He concluded that bail should be lowered—to $50,000 for Maringolo and $25,000 for Troiano.

If petitioners had been able to post those amounts, they would then have been set free. It must be presumed, therefore, that Judge Abruzzo, balancing the interests made pertinent by the Congress in the Bail Reform Act of 1966, 18 U.S.C. § 3146 et seq. deemed this an acceptable measure of the risk unquestionably present in every such determination.

In fact, the petitioners did not manage until August 11, almost two weeks later, to post the bail Judge Abruzzo had ordered.[2] Meanwhile, however, on August 8, the Immigration and Naturaliza-

---

1. A small procedural quirk at the outset might have produced delays which the Special Assistant United States Attorney has willingly assisted in avoiding. The petition was originally filed in the Eastern District of New York where petitioners are awaiting trial on the criminal charges hereinafter discussed. Judge Rosling, on September 15, 1969, endorsed the papers with his conclusion that venue lay properly in this District, directed that the matter be returnable in our motion part at 2:00 p. m. on the following day, and delivered the papers to petitioners' counsel for implementation of that directive.
   Because we had no case on file here, and for weightier reasons both technical and physical, it was not possible for petitioners to bring the matter on by September 16. But government counsel did move with dispatch, for which the court is grateful, and the matter was argued on the morning and afternoon of September 19.

2. Defense counsel, also appearing for them here, represents that petitioners' families raised cash in the substantial amounts required, and this was deposited in the Eastern District. No question appears to have been raised about this by the prosecution. Cf. United States v. Nebbia, 357 F.2d 303 (2d Cir. 1966).

tion Service had formally initiated deportation proceedings by orders to show cause, and had issued warrants of arrest. Upon their formal enlargement on bail by the Eastern District Court, petitioners were promptly "taken into custody" by the Service, so that there was actually no interruption of their confinement in the Federal House of Detention. On August 12, they applied to the district director for their release. The request was denied, and they were ordered to be held without bond. On August 18, they obtained a re-determination of this question by a special inquiry officer, who ruled that they could be released if each posted $25,000 in addition to the amount on deposit for him in the Eastern District. On appeal by petitioners, the Board of Immigration Appeals sustained this ruling (on September 5, 1969), which is now before this court.

In a memorandum explaining his determination the special inquiry officer reviewed the circumstances of petitioners' arrival in the United States, their arrests, and their indictments. He observed that "[t]he government believes that each of these aliens was acting in concert with each other and others in the smuggling of narcotics into the United States." He recorded that Troiano is reported to have some sort of "criminal record in Argentina," citing no convictions but saying it is "indicated that one of these arrests involved smuggling, although the contraband involved is not known." He noted that Maringolo has until September 29 for motions in his criminal case, so that trial would be "some six or more weeks away." And he considered the fact that their deportation proceedings will be postponed until after the conclusion of their criminal trials. In light of that circumstance, he continued:

"* * * I believe that their release under substantial bond to insure their appearance before the Service in these deportation proceedings would be warranted. The respondents argue that because they were released by the District Court under bonds which

amounts [sic] to $50,000, in the case of Valela, and $25,000, in the case of Fernandez, the Service should release them in nominal bonds. While this argument has a superficial appeal, it overlooks the fact the [sic] the criminal proceeding and this proceeding are entirely independent one of the other. The existence of the criminal bond does not operate to compel their appearance before this Service. The respondents entered the United States by documentation which concealed their true identity. In a very real sense this was a surreptitious entry. They have thus revealed themselves as persons likely to conceal themselves within the society. If they are, in fact, engaged in narcotics traffic as is suspected, they are engaged in a field where, not only the risks, but the rewards are very high. They have no roots in the community and, indeed, their own counsel pointed out that if they were prepared to jump the court bond, they would most likely jump the immigration bond as well. Perhaps so, but they are far more likely to do so if the immigration bond is merely nominal than if it is substantial and does operate to raise the motivation to appear when and as required. The District Court has set relatively high bond in each of their cases. The respondents have managed to post the amount set, nevertheless. The $25,000 bond set by the District Court in the case of Fernandez is, in my judgment a reasonable one for the Attorney General to impose. Accordingly, I will grant the respondents [sic] application that their custody status be changed to the extent that they may be released under bond in the sum of $25,000 each."

The written decision of the Board of Immigration Appeals summarized at length what the special inquiry officer had said, and stated its grounds for affirmance as follows:

"After carefully considering all the evidence of record, together with the representations of counsel by brief on

appeal, we find nothing therein that would warrant a reduction of the $25,000 bond required for the release of each respondent or justify any change being made in the special inquiry officer's action of August 18, 1969. The manner in which the respondents effected their entry into the United States together with the nature of the crime which resulted in their being apprehended by enforcement officers of the United States Government are factors to be considered in arriving at a decision in this case."

## II.

■ Since decisions of the Attorney General's delegates on bail pending deportation proceedings may be set aside only for abuse of discretion, United States ex rel. Belfrage v. Shaughnessy, 212 F.2d 128, 129 (2d Cir. 1954); United States ex rel. Potash v. District Director, 169 F.2d 747, 751 (2d Cir. 1948); cf. Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), or for fundamental errors of law affecting the scope of the supposed discretion, cf. McGrath v. Kristensen, 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173 (1950), or the lawful manner of exercising it, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), this court recognizes that cases warranting displacements of the administrative determination are likely to be rare. The present case is such a one, however; the order of the special inquiry officer is fatally infirm because it misconceives the relationship between the pending criminal and administrative proceedings. In treating this central subject, the officer

(1) operated upon an "invalid assumption," *Belfrage, supra,* 212 F.2d at 129, as to the "independence" of the two sets of proceedings; and

(2) ignored the potential and actual conflict between his ruling and the judicial order setting bail in the criminal cases, overlooking in-

escapably relevant concerns embodied in the recent Bail Reform Act.

These flaws, considering all the circumstances, compel revisions of petitioners' bail status designed to reconcile the claims to fairness recognized by the Eastern District in its criminal proceedings with the unquestionably weighty interests administered by the immigration authorities.

1. In outlining the concerns adverse to petitioners, the inquiry officer stressed primarily and at some length the serious crimes with which they have been charged. He recognized the practical point that the criminal trials will go forward first—or at least before deportation, if it is decreed, can be accomplished. He was informed that the federal court— aware of the prospective deportations as well as its own immediate matters—had fixed bail in the amounts of $50,000 and $25,000 in the belief that these sums "will reasonably assure the appearance" (18 U.S.C. § 3146) of the petitioners for their trials. Knowing these things, and urged to rule that they should lead at most to a nominal bond for the postponed deportation proceedings, he said:

"While this argument has a superficial appeal, it overlooks the fact the [*sic*] the criminal proceeding and this proceeding are entirely independent one of the other. The existence of the criminal bond does not operate to compel their appearance before this Service."

The first of the quoted sentences may be correct in some sterilely technical sense, but not otherwise. The second is correct only if we ignore the ample power "to compel" what the officer chose to regard as not being compelled.

The proceedings are obviously not "independent one of the other" in any substantial respect, as will be developed a bit more fully below. The inquiry officer found the criminal cases critically important for his view that high bail is required. Indeed, his primary concern, and that of the United States Attorney

in this court, has been with the undoubtedly serious matter of narcotics smuggling rather than the less exciting sequel of potential deportation.[3] It was only when he looked at the other side of this same coin that the officer found its significance thinned to superficiality.

The same kind of unbalanced view appears to have led to the essentially mistaken thought that the large amount of cash petitioners posted in the Eastern District "does not [and, presumably, cannot] operate to compel their appearance before [the] Service." The readily evident answer is that the money can and will "operate to compel" such appearance if it is ordered (or agreed) that it will. When this court touched the subject at the outset of our hearing, the Special Assistant United States Attorney acknowledged promptly and with his invariable frankness that he had contemplated as a "fall-back" position urging that the Eastern District security, if and when it is no longer required there, should remain as bail for the deportation proceeding. Counsel for petitioners, equally promptly, agreed that this is an obviously feasible arrangement. This court, adding further safeguards urged on behalf of the Service, will adopt it.

The result, it should be said, leaves intact the prior and authoritative judgment of Judge Abruzzo as to the amounts needed for what all agree are the main events, the criminal trials. If and when the further stage here contemplated is ever reached—namely, petitioners' release by the Eastern District from the restraints imposed there—these amounts should be adequate to insure that petitioners do not flee before they can be ordered to leave.

2. In purporting to seal off its "independent" proceedings, the Service ignored the substantial and inevitable effects of its decision upon the state of affairs ordered by the Eastern District. Judge Abruzzo was apprised of, and must be supposed to have considered, the importance of release for the petitioners in the preparation of their defense. This is a basic factor among those underlying the liberalizing commands of the Bail Reform Act of 1966. See S.Rep.No. 750, 89th Cong., 1st Sess. 6–7 (1965); H.R. Rep.No. 1541, 89th Cong., 2d Sess. 8–9 (1966). Moreover, when he weighed that and everything else, the Judge was apprised of the fact that petitioners also faced deportation proceedings. Taking everything together, he set the amounts of bail he thought sufficient to give "reasonable assurance" that petitioners would appear for what was and remains their first and gravest trials. He did this with the expectation that petitioners would go free if they posted the amounts he had prescribed.

That exercise of judicial discretion—under the latest expressions of authoritative Congressional judgment on the subject of bail—has been nullified in practical effect by what is asserted as a wholly separate and "independent" act of administrative discretion. The officers making this later judgment have not consciously overridden—they have simply failed to take into account—the prior exercise of judgment upon which theirs so heavily impinges. In setting aside the action thus taken, this court has

3. It is an interesting sidelight that after this court had indicated on the morning of September 19 its disposition to revise the administrative decision—thus far defended by the able Special Assistant normally charged with such matters—the laboring oar in resisting such revision was taken in the afternoon by the Chief of the Narcotics Unit of the United States Attorney's Office. His earnest arguments were directed exclusively to the area of his duties involving criminal traffic in narcotics. He expressed dissatisfaction with the lowered bail in the Eastern District and indicated measures he would have pursued had he been handling matters there. This sidelight casts at least a small glow of its own on the special inquiry officer's conclusion that "[t]he $25,000 bond set by the District Court in the case of [Troiano] is * * * a reasonable one for the Attorney General to impose." The "reasonable" sum happens, coincidentally, to impose again the seemingly insuperable obstacles to release lowered, over the Attorney General's opposition, by Judge Abruzzo.

no occasion to, and does not, rule that the administrative officers in such circumstances are required simply to "defer" to the prior judicial determination.

It is enough to recall that the broad executive discretion here involved is not unlimited; the Attorney General's delegate is subject to review and correction where he has "misconstrued the limits or terms of his discretionary power * * *." Sovich v. Esperdy, 319 F.2d 21, 26 (2d Cir. 1963).[4] The deciding officer must not be "actuated by considerations that Congress could not have intended to make relevant." United States ex rel. Kaloudis v. Shaughnessy, 180 F.2d 489, 491 (2d Cir. 1950). Similarly, he may not lawfully decide by excluding considerations that cannot be deemed irrelevant in light of the legal parameters defining the issues for judgment. Cf. Dunat v. Hurney, 297 F.2d 744 (3rd Cir. 1961, 1962); Cotonificio Bustese, S.A., v. Morgenthau, 74 App. D.C. 13, 121 F.2d 884 (1941). These principles apply here.

It might follow, in more leisurely areas where the interests at stake are not bled by delay, that the matter should go back to be weighed with the requisite thoroughness. But the special facts of this case, where petitioners have already "served" five months without being convicted of anything, would seem to comprise one of the infrequent occasions when the court itself should proceed to order release on conditions it prescribes. Cf. United States ex rel. Belfrage v. Shaughnessy, 212 F.2d 128 (2d Cir. 1954). This will be done.

### III.

Omitting details which have been discussed and largely agreed upon with counsel, an order will enter providing for petitioners' release upon the following conditions:

(1) That if and when the cash posted in the Eastern District becomes available for release to petitioners by that Court, it shall be deposited as bail pending their deportation proceedings.

(2) That petitioners will report daily in person to the Immigration and Naturalization Service, it being conceded by them that this security measure imposes no undue hardship.

The nature of this court's order is such that a stay of long or indefinite duration would be a stultifying self-contradiction. Upon the government's application, however, the order will contain a 72-hour stay to afford time for the consideration by the Court of Appeals or one of its Judges of such further or different relief as may be deemed appropriate pending appeal.

---

4. The cited case reviews and analyzes the pertinent principles and authorities.