**UNITED STATES ex rel. CASTRO-LOU-ZAN v. ZIMMERMAN et al.**

**No. M-1414.**

United States District Court
E. D. Pennsylvania.

Nov. 17, 1950.

Jacob J. Kilimnik, Philadelphia, Pa., for petitioner.

James P. McCormick, Asst. U. S. Atty., Karl I. Zimmerman, District Director, Immigration and Naturalization Service, Philadelphia, Pa., for respondent.

CLARY, District Judge.

Relator Manuel Castro-Louzan, presently in the custody of Karl I. Zimmerman, District Director of Immigration and Naturalization, on a warrant of deportation, has sued out a writ of habeas corpus challenging the validity of his detention under that warrant. A proper consideration of the case requires a rather extended discussion of the facts.

Manuel Castro-Louzan is a seaman who has followed that calling for many years. He is a native born citizen of Spain. From time to time as his vessel touched American ports he has been admitted to the country as a bona-fide seaman. In the course of one of his voyages, he entered the port of San Pedro, California, on the 24th day of July, 1950. On July 29th, 1950, he was examined at that port by an Examining Officer of the Immigration and Naturalization Service and was admitted, pursuant to Section 3(5) of the Immigration Act of 1924, 8 U.S.C.A. § 203(5), for the period of time the vessel was to remain in the United States and in no event for longer than 29 days. Significantly, the record of his admission indicates that on that very day he was discharged from the vessel. The vessel left the following day for Japan. Relator testified that not only was the fact that he was being discharged made known to the Examining Officer but further that he was informed that his stay in the United States should not exceed 29 days. The record of the Officer in Charge, Immigration and Naturalization Service, at that port, San Pedro, California, fails to reveal that the Relator's period of admission into the United States was extended. There is no doubt in my mind that Relator intended no violation of the Immigration Laws of the United States and that he was of the distinct impression that he was properly and legally in the United States. He immediately left for New York to ship out on another vessel of the same line. A letter in the record indicates that there was and is a position as seaman open to him on one of its ships.

About one year previously, Relator together with one Nemesio Vasquez had purchased a residential property in Philadelphia, each owning one-half of said property. Nemesio Vasquez, up until the present occurrence a friend of the Relator, had transacted business for the Relator. On one occasion Relator had given him $700.00 to deposit in a bank account which Relator maintained in a Philadelphia bank. Mr. and Mrs. Vasquez were the only friends of Relator in Philadelphia. As stated above, Relator was a citizen of Spain, spoke only the Spanish language, and was entirely unfamiliar with the English language. On his way to New York and to his outgoing vessel, he stopped off in Philadelphia to check on his business affairs. Nemesio Vasquez took him to a person whom Relator testified was a "lawyer", but whom counsel for Relator in this proceeding assures the Court was not a lawyer, and a paper was drawn up which Relator testified fraudulently deprived him of his one-half ownership in the residential property without any compensation to him. On that evening, August 4, 1950, a violent quarrel arose in the Vasquez household. The testimony is not entirely clear as to the cause of the quarrel. There was

drinking and the ultimate result of the quarrel was that both Relator and Mrs. Vasquez were ordered out of the house, or driven out of the house by Nemesio Vasquez. Relator, a stranger in Philadelphia, was taken by Mrs. Vasquez to the Clinton Hotel. There someone, not the Relator, registered Mr. and Mrs. Manuel Castro-Louzan. Relator and Mrs. Vasquez remained in the hotel overnight but Relator vehemently denies any wrongdoing and said that the previous events were uppermost in both their minds. At any event, early the next day Mrs. Vasquez and the Relator went to the bank to check upon the condition of the bank account and there Relator found that instead of the many hundreds of dollars which he should have on deposit, he found only $10.00 in the bank, which he withdrew. Vasquez made several calls to them at the hotel and persuaded them to return to the house to discuss the whole matter. Another quarrel ensued. Vasquez attacked Relator with a knife inflicting wounds on his arm, hip and stomach. In self-defense, Relator struck his attacker over the head with a bottle. The Relator ran from the house and sought the protection of a Philadelphia Police Officer. Since the Officer could not understand Relator's language, he took him first to a hospital and then to a police station where he was slated on a charge of assault and battery and later taken to Moyamensing Prison.

Word of his detention having come to the Office of the Immigration authorities, a representative of that Service interviewed him at the prison and, with a guard acting as an interpreter, a statement was taken from the Relator in which he set out fully and completely the facts of his arrival and presence in the United States. In that statement which was presented in Court and from which the representative testified, there was no mention made of the Clinton Hotel or any reference to Relator's visit to the Clinton Hotel, its reason or purpose. On August 7, 1950, an Immigration warrant of arrest was issued charging Relator with being in the United States in violation of the Immigration Act of May 26, 1924, 8 U.S.C.A. § 201 et seq., in that he had remained in the United States longer than permitted under said Act or Regulations made thereunder. On August 9, 1950, in Moyamensing Prison and with an interpreter provided by the Immigration Service present, a hearing was held. Asked by the Hearing Examiner whether he desired counsel, Relator said very emphatically that he did desire counsel, and he was given 48 hours to produce his own counsel at his own expense. The only assistance accorded him was permission to use the telephone. In 48 hours the hearing resumed and Relator was still without counsel. This is perfectly understandable in view of the fact that the only people he knew in Philadelphia were Mr. and Mrs. Vasquez, who were the real reason for his incarceration. Friendless and almost penniless and in a strange land, the Relator was asked on August 11th whether he would go on without counsel and he agreed to do so. He was thereupon sworn and the Hearing Officer first read to him the pertinent sections of Title 18 U.S.C.A. § 1621, relating to perjury, and that part of the Immigration Act of March 4, 1929, 8 U.S.C.A. § 180 et seq., relating to the penalties provided for any person deported from the United States who attempts to re-enter it. He was then examined by the Examining Officer and the Hearing Officer regarding his presence in the United States and all the facts of his entry and presence in the United States were fully and freely admitted by him. Upon examination by the Examining Officer, he averred the fraudulent taking of his real estate without compensation and admitted the fact of his visit to the Clinton Hotel. No inquiry was made as to the facts surrounding the charge of assault and battery on which he was being held, nor did the Examining Officer develop any facts relating to the bank account. When the Hearing Examiner asked him whether he had any evidence which he would like to have incorporated into the record, his answer was "What can I say?". Advised that he had the right to ask to depart voluntarily at his own expense, he requested that right, since he knew his employer had a position as seaman open to him. This fact is confirmed by a subsequent letter of his employer placed in evidence. The Hearing Examiner then

stated to the Relator his proposed findings of fact and his conclusions of law, one of which was that the Relator should not be allowed to depart voluntarily because he had failed to establish good moral character. In answer to an express question by the Court at the hearing on the habeas corpus writ, the Examiner stated unequivocally to the Court that absent the untried charge on which the man was being held, there would be no reason why this man should not have had a certificate of good moral character and why he should not have so certified. As stated before, no inquiry was made as to whether Relator had a defense to the charge which, on his testimony, he did have and which defense is all the more persuasive since in late September the charge was nolle prossed in the Courts of Philadelphia County. Asked whether he wished to take exception, he stated that he did. While the matter was certified to the Board of Immigration Appeals which affirmed the action of the Hearing Examiner, no explanation was given to the Relator of his right to appear in person or by counsel before the Board of Immigration Appeals to argue his cause. The matter was considered by the Board on the bare record.

Early in October, Relator finally secured counsel, who promptly asked for a rehearing, which was denied. He then sued out this writ.

### Discussion

The fundamental question involved in this case is whether this Relator has been deprived of due process of law in violation of the Fifth Amendment to the Constitution of the United States. Due process requires a full and fair hearing even before an administrative tribunal. While it is well settled that the United States has plenary power to provide that aliens shall be deported on terms and conditions of its own choice, deportation without a fair hearing or on charges not supported by any evidence constitutes the denial of due process which may be prevented by habeas corpus. U. S. ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Nicoli v. Briggs, 10 Cir., 83 F.2d 375. Strict adherence to judicial procedure is not required in a hearing in a deportation proceeding but where in a hearing there is some practice which contributes to a denial of justice or any other essential element of due process, then such action may be challenged by habeas corpus. Bufalino v. Irvine, 10 Cir., 103 F.2d 830. It was also stated in Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, that where evidence is improperly received and where but for that evidence it is wholly speculative whether the requisite finding would have been made, there is then a deportation without a fair hearing which may be corrected on habeas corpus.

The record of the hearings of the Immigration and Naturalization Service which are incorporated in full in the Government's return to the writ indicate on the surface that the formalities of a fair hearing were observed in that Relator was advised that he had a right to counsel. The substance of a fair and intelligent hearing, intelligent in the sense that the prisoner had knowledge of his rights and that his rights were being protected was entirely lacking. Informing a prisoner with total resources of $30.00, a stranger in a strange land with a complete lack of knowledge of the language of that country, that he had a right to counsel is almost an empty gesture. Under the Rules of the Immigration and Naturalization Service, as testified at the hearing, representatives of that Service are forbidden in anywise to assist prisoners in obtaining counsel. This explanation was given to me as the reason for their total lack of action in that regard. Since, however, there are presently in Philadelphia the Legal Aid Society to assist the indigent and the Reference Agency of the Philadelphia Bar Association to assist those who need the assistance of counsel and do not know any particular lawyer, this explanation does not appeal to me. The end result of Relator's position was that he was virtually *incommunicado* despite permission granted to use the telephone.

In a matter involving a person's liberty, it is my opinion that we must look to the substance rather than the form. I am not undertaking to hold that a person

has an absolute right to counsel before administrative boards, nor am I holding that a denial of counsel would in every case prevent such proceedings being fair. Where, however, as in this case, important facts having a very distinct bearing on the ultimate outcome of the case were not presented because of the absence of counsel, then I have no hesitancy in finding that it did not meet the requirements of a fair hearing. I agree with the statement of Judge Sanborn in the case of Whitfield v. Hanges, 8 Cir., 222 F. 745, 748, that an alien as well as a citizen is protected by the universal principle that no person shall be deprived of life, liberty, or property without due process, and that his hearing must be in accord with the "fundamental principles that inhere in due process of law". Had all the facts which were adduced before me been presented at the hearings before the Immigration and Naturalization Service, even though counsel were not present, it is quite possible that my decision would have been to the contrary; but where facts are not presented which in all probability would have had an important bearing upon the judgment exercised by the Immigration and Naturalization Service, then the denial of the opportunity to present such facts offends my sense of fairness. It would in my opinion be a reflection upon the American system of jurisprudence if this impecunious alien in the light of all the circumstances were to have the legal consequences of deportation visited upon him without having a full and complete opportunity to present for the determination of the Immigration and Naturalization Service all the facts adduced in the record before me.

Since the finding of the Immigration and Naturalization Service of a failure to establish good moral character for a period of five years was based solely upon an untried charge and at the hearing Relator had stated a full and complete defense (if believed), I feel that there was a duty upon that Service to inquire into the facts attending the bringing of the charge or await the trial of that charge before concluding that good moral character had not been established. Particularly is this so since the charge was subsequently nolle prossed.

I do not mean to indicate by what I have said that I am attempting to usurp or interfere with the exercise of a discretion which lies solely with the Attorney General or those to whom he has delegated that discretion. Under the provisions of 8 U.S.C.A. § 155, the Attorney General is given the sole discretion to permit voluntary departure in lieu of deportation in certain enumerated situations. That problem is not before me. The basis for my holding is that the administrative tribunal has denied the Relator due process of law in violation of the Fifth Amendment to the Constitution of the United States in that he was not accorded a "full and fair hearing". Any action, therefore, based on such a hearing is a nullity.